**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

LATAM LOGISTIC INVESTMENTS, LLC; and
MICHAEL P. FANGMAN,

               *Plaintiffs*,

    v.

LOGISTIC PROPERTIES OF THE AMERICAS;
LATAM LOGISTICS PROPERTIES, S.A.;
THOMAS J. MCDONALD; ESTEBAN
SALDARRIAGA; PAUL SMITH; and ANNETTE
FERNANDEZ,

               *Defendants*.

Case No.

---

### INDIVIDUAL COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS, BREACH OF CONTRACT, AND OTHER TORTIOUS CONDUCT

Plaintiffs Latam Logistics Investments, LLC ("LLI") and Michael Patrick Fangman, Jr., through counsel, allege the following based on personal knowledge of Plaintiffs as to Defendants' own acts and contracts and, upon information and belief, as to other matters based on investigation conducted by Mr. Fangman and Plaintiffs' attorneys, including *inter alia* review and analysis of: (a) regulatory filings made by Logistic Properties of the Americas ("LPA") with the United States Securities and Exchange Commission; (b) consolidated financial statements of LatAm Logistic Properties, S.A. ("LLP") filed with the United States Securities and Exchange Commission; and (c) other public information regarding LPA, including its public statements made on the LPA's website. Plaintiff believes that substantial evidentiary support exists and will be discovered for the allegations set forth herein after a reasonable opportunity for discovery. In support thereof, LLI alleges as follows:

## NATURE OF THE ACTION

1.     This securities action is brought individually on behalf of Plaintiffs LLI and Michael Fangman who were defrauded of their ordinary shares of Logistic Properties of the Americas following consummation of a business combination or merger between LLP, LPA, and a special purpose acquisition company ("SPAC"), which, effective March 27, 2024, resulted in LLP merging into LPA (the "Business Combination"). Following the consummation of the Business Combination, LPA offered its ordinary shares for public sale, and on March 28, 2024, it was listed for trade on the New York Stock Exchange.

2.     Some of the claims asserted in this Complaint are alleged against LPA, LLP, the wholly owned subsidiary and predecessor to LPA, and certain of LPA's senior executive officers and non-independent directors and arise under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder. Additionally, Plaintiffs assert non-fraud claims sounding in negligence and strict liability under §§ 11, 12(a), and 15 of the Securities Act of 1933 (the "Securities Act"). The claims herein also include breaches of contract and tortious conduct by LPA and LLP that are inextricably linked with the alleged Exchange Act violations.

3.     LLI is the beneficially owned company of Michael Fangman, a founder and former executive of LLP. Prior to the Business Combination, LLI was the owner of 8% of LLP.

4.     LPA is a developer, owner, and manager of institutional quality, industrial and logistics real estate in Central and South America with its principal executive offices in Miami, Florida. Prior to the Business Combination, LPA had no material assets or operations. As a result of the Business Combination, LLP merged into a subsidiary of LPA. Moreover, the historical operations of LLP were adopted by and are deemed to be those of LPA.

5.     Beginning in 2017, LLP made loans to LLI, for the benefit of Mr. Fangman, to address phantom tax events related to company activities.

6.     In January 2021, LLP converted its corporate structure from a limited liability company to a Sociedad Anónima, under the laws of Panama. As part of that conversion, LLI entered into a pledge agreement pledging its shares of LLP to guarantee four tax loans totaling $4.165 million along with a balance of $874k in interest accrued on those loans. The amounts owed were reflected in two promissory notes, both maturing on December 31, 2023.

7.     Additional loans were made to LLI in 2021, in the amount of $685,000, and in 2022, in the amount of $2.1 million.

8.     On August 15, 2023, prior to maturity for the promissory notes, LLP announced publicly its intention for the Business Combination. LLP never informed Mr. Fangman of that plan; instead, he learned of the proposed merger through the public filings. LLP's shareholders purportedly approved  the merger plan at an extraordinary shareholder meeting on November 30, 2023.

9.     On January 4, 2024, LLP sent demands for payment on the promissory notes to LLI and Mr. Fangman, by email and by mail to Mr. Fangman's last United States address in Arizona. Additionally, LLP sent separate demand for payment of $2.1 million. LLP did not make any payment demand for the 2021 loan amount ($685,000) or any other principal increase on the promissory notes. No further communications occurred between LLP and LLI.

10.     In LPA's Amended Registration Statement of March 6, 2024, LPA and LLP acknowledged that, as of that date, LLI "own[ed] 8.0% of [LLP]" and held a right to redeem those shares for 2,288,000 shares of LPA, with an initial value of not less than $10.00 per share.

11.     In LPA's Prospectus of March 12, 2024, LLI, "beneficially owned by Michael Patrick Fangman Jr.," was listed as owning between 6% and 6.6% of LPA upon consummation of the Business Combination. However, LPA falsely stated that the shares were subject to an already initiated foreclosure proceeding.

12.     Regardless of any alleged foreclosure, under the previously filed Registration Statement and Business Combination Agreement, LLI reasonably anticipated that the value of its shares of LLP, and the right to LPA shares, vastly exceeded the amount owed on the promissory notes and/or any subsequent tax loans.

13.     Days later, on March 27, 2024, the Business Combination was consummated, and LPA shares were issued and offered for trading on the NYSE.

14.     In its first annual report, filed March 28, 2024, LPA no longer listed LLI as a beneficial owner. Instead, LPA and LLP issued false and misleading statements claiming LLP had initiated formal foreclosure proceedings and that, on March 12, 2024, LLI had entered into an assignment agreement assigning LLP its right, as a result of the Business Combination, to receive 2,288,000 LPA ordinary shares.

15.     In fact, there was no foreclosure proceeding and no assignment agreement; moreover, LLI was never provided a letter of transmittal explaining how to exercise its rights under the Business Combination Agreement. LLP's provision of that documentation that was required for consummation of that Agreement.

16.     In subsequent public filings, LPA and LLP disclosed that the fair market value of the LLP shares held by LLI was $24,481,600. LLP tortiously and in violation of the Pledge Agreement retained more than $14.7 million dollars after satisfaction of the secured notes. Instead of returning that money to LLI and Mr. Fangman, LLP allegedly issued a stock dividend

to LPA. LPA thereby tortiously retained an improper benefit and improperly increased its equity position and the per-share value of LPA shares.

17.     As a result of Defendants' intentional misrepresentations and tortious conduct, Plaintiffs have suffered significant losses, including the lost beneficial ownership of LPA ordinary shares, as provided by the Business Combination Agreement.

## PARTIES

18.     LatAm Logistics Investments, LLC is a limited liability company organized under the laws of Delaware. It can be served at Corporation Services Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

19.     Michael Patrick Fangman, Jr. is a citizen of the United States and maintains his principal residence in San José, Costa Rica.

20.     Logistic Properties of the Americas is a Cayman Islands exempted corporation with its principal executive offices located in Miami, Florida. According to LPA's Registration Statement, LPA's agent for service is Thomas McDonald with a principal office address of 601 Brickell Key Drive, Suite 700, Miami, Florida 33131.

21.     Latam Logistics Properties, S.A. is a wholly owned subsidiary of LPA. LLP is incorporated under the laws of Panama. On information and belief, prior to the Business Combination, LLP's controlling majority shareholder and controlling investor (with 88.8% ownership) was JREP I Logistics Acquisition, LP. Through a series of United States-based limited liability companies, LLP's controlling capital partner was Jaguar Growth Partners LLC, a New York-based company formed under the laws of Delaware. Pursuant to LPA's public filings and merger, "[t]he historical operations of LLP prior to the Business Combination are deemed to be those of [LPA]."

22. Thomas J. McDonald, served on LLP's board of directors prior to the business combination. Since 2013, he has been the Managing Partner of Jaguar Growth Partners Group, LLC ("JGPG") and the Managing Partner and Head of the Americas for Jaguar Growth Partners, LLC. JGPG manages the investment fund (JREP GP, LLC), which in turn manages two funds, JREP I Logistics Acquisition, LP ("JREP I") and Jaguar Real Estate Partners, LP. On information and belief, JREP I was the majority shareholder and controlling investor of LLP, and JREP I along with Jaguar Real Estate Partners, LP became the majority shareholder and controlling investor of LPA. On information and belief, Mr. McDonald serves as the managing member of JGPG and is named in public filings as the beneficial owner of the majority of LPA. He serves as a Non-Independent Director and Chairman of the Board of Directors for LPA. He also is identified in LPA public filings as LPA's agent for service. On information and belief, Mr. McDonald is a resident of Miami, Florida.

23. Prior to the Business Combination, Esteban Saldarriaga served as Chief Executive Officer of LLP beginning in November 2022. Following the consummation of the Business Combination, Mr. Saldarriaga assumed the role of CEO of LPA. On information and belief, Mr. Saldarriaga is a resident of Miami, Florida.

24. On or around May 2024, Paul Smith-Marquez was named Chief Financial Officer of LPA. On information and belief, he is a resident of the State of Florida.

25. Prior to the Business Combination, Annette Fernandez served as Chief Financial Officer for LLP beginning in 2017. Likewise, she assumed the role of Chief Operating Officer for LLP in 2023. Upon consummation of the Business Combination, she assumed the role of CFO for LPA, until Paul Smith-Marquez was named CFO, and she was named COO of LPA in May 2024. On information and belief, Ms. Fernandez is a resident of the State of Texas.

26.     Defendants McDonald, Saldarriaga, Smith-Marquez, and Fernandez are sometimes referred to as the "Individual Defendants." Those Individual Defendants possessed and possess the power and authority to control the contents of LPA's SEC filings and other market communications. The Individual Defendants were provided with copies of LPA's SEC filings and public statements, alleged herein to be misleading, prior to or shortly after their issuance, had the ability and opportunity to prevent their issuance or to cause them to be corrected, and indeed, certified those public statements and filings. Because of their positions with LPA and LLP and their access to material information available to the Individual Defendants but not to the public, the Individual Defendants knew that the representations made by LPA and LLP, as to Plaintiffs, were then materially false and misleading. As a result, the Individual Defendants are liable for the false statements and omissions pleaded herein.

## JURISDICTION AND VENUE

27.     Some of the claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), as well as Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

28.     Additionally, some of the claims asserted herein arise under §§ 11, 12(a), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a), and 77o.

29.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

30.     In addition, pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over claims that are related to, and form part of, the same case and controversy.

31.     Venue is proper in this Judicial District pursuant to § 27 of the Exchange Act and 28 U.S.C. § 1391. LPA maintains its principal executive offices in Miami, Florida, which is located within this Judicial District; on information and belief, Defendant McDonald is a resident

of and maintains his office in Miami, Florida; LPA conducts business in this Judicial District; and a significant portion of Defendants' activities, including drafting or issuance of public filings, relevant to this action took place within this Judicial District.

32.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to interstate telephone communications and the facilities of the national securities markets.

## SUBSTANTIVE ALLEGATIONS

**A.  Forming of LLP, Tax loans to LLI, and Pledge Agreement between the parties.**

33.     In 2014, Mr. Fangman founded LatAm Logistics Properties (later organized as LLP, S. de R.L.), which developed warehouse building projects in Latin America. In early 2015, Jaguar Growth Partners LLC ("Jaguar") joined the company.

34.     In June 2015, the group established JREP I Logistics Acquisition, LP, an investment vehicle, operating under New York law, with Jaguar as the general partner.

35.     As a result of LLP's change in corporate structure, the parties, including LLP and JREP I Logistics Acquisition, LP, acknowledged that the structure could result in unfavorable tax events for Mr. Fangman. Accordingly, the shareholder agreement permitted Mr. Fangman, through his beneficially owned company, LatAm Logistic Investments, LLC, to receive tax loans.

36.     In 2017, LLP made the first tax loan to LLI for the benefit of Mr. Fangman.

37.     From 2017 to 2020, LLP made annual tax loans to LLI totaling $4.165 million.

38.     On December 31, 2020, LLI executed two promissory notes, one for principal that accrued interest at 9% per annum, in the amount of $4.165 million, and another for already-accrued interest that did not bear any interest, in the amount of $874,123.

39.     That same day, LLI and LLP also entered into a Pledge Agreement securing those notes with LLI's shares of LLP, which totaled 8% of the issued shares of LLP.

40.     No other promissory notes or security agreements exist between LLI and LLP.

**B. Failed Colombian IPO and falling out between Mr. Fangman and Jaguar Growth Partners**

41.     In January 2021, LLP shifted corporate structure to a Sociedad Anónima. This change prompted the need for the promissory notes and Pledge Agreement. LLP completed this change on January 13, 2021.

42.     On or around April 2021, Defendant McDonald and Jaguar Growth Partners LLC, the controlling capital shareholder of LLP, determined that, in order to raise capital, LLP should have an initial public offering on the Colombian stock exchange. This IPO resulted in additional tax implications for the shareholders.

43.     In June 2021, LLP made a new tax loan to LLI for $685,000.

44.     In August 2021, for a variety of reasons, the Colombian IPO failed to raise the expected capital; however, LLP was now listed on the Colombian stock exchange.

45.     Later that year, Mr. Fangman flew to Miami, Florida to meet with Thomas McDonald to discuss LLP's financing and structure, and throughout 2022, McDonald and the Jaguar team, while located in Florida and/or New York, continued to hold virtual meetings with Mr. Fangman.

46.     In May 2022, LLP made a new tax loan to LLI for $2,100,000.

47.     In November 2022, Mr. McDonald and Jaguar leadership proposed delisting LLP. Under rules of the Colombian exchange, however, delisting could only be accomplished with unanimous shareholder approval.

48.     Mr. Fangman, through LLI, opposed the move because, *inter alia*, (a) insufficient information was provided on the new proposed governance structure and (b) no information was provided regarding protections for minority shareholders.

49.     In response, in late November 2022, LLP terminated Mr. Fangman, an officer of LLP. With limited exceptions, the company ceased communicating with him at this time, which also meant that LLP no longer communicated with its shareholder, LLI.

### C.  Proposed Business Combination Agreement

50.     On August 15, 2023, LLP and a SPAC entity named "two" announced publicly their intentions to enter into a Business Combination Agreement for merger into a newly created entity (then, Pubco; later named Logistic Properties of the Americas).

51.     LLP never notified LLI or Mr. Fangman of the proposed merger; instead, Mr. Fangman found out about the proposed merger sometime after August 15, 2023 through review of public filings and public statements.

52.     Under the proposed Business Combination Agreement, all LLP ordinary shares were automatically cancelled and ceased to exist in exchange for the right to receive a pro rata share of LPA ordinary shares, valued at $286,000,000 with a per-share value of $10.00.

53.     Based on this public disclosure, LLI reasonably anticipated that the LLP ordinary shares it possessed had an estimated value of not less than $22,880,000.

54.     Under the Business Combination Agreement, on or before the closing date, LLP was required to send all shareholders a "letter of transmittal," which was required to explain the steps necessary for delivery of certificates for LLP ordinary shares and receipt of LPA shares.

55.     LLP's delivery of the letter of transmittal to its shareholders was necessary for consummation of the Business Combination Agreement.

56.     The letter of transmittal was never provided to LLI or Mr. Fangman.

57.     In November 2023, LLP called an extraordinary shareholder meeting with the intention of approving the merger. LLP provided notice of the meeting to LLI; however, prior to the meeting, LLP did not distribute either the merger agreement or a draft of that document to shareholders.

58.     At the meeting, on November 30, 2023, Defendant Saldarriaga declined to answer questions regarding the impact of the merger on minority shareholders. Instead, he represented that the merger was effectively a stock swap and that all shareholders of LLP, including LLI, would receive common shares of Pubco, later LPA, based on capitalization tables published in LPA's filings, depending on redemptions by "two" (the SPAC entity) and a potential PIPE investment, a form of bridge financing from a new investor.

59.     Purportedly, the merger proposal was put to vote on November 30, 2023. Purportedly, it was approved with 92% support.

60.     In LPA's initial Registration Statement, filed December 8, 2023, LLI was correctly listed as owning 8% of LLP's issued and outstanding ordinary shares.

**D.  Demands for payment of promissory notes**

61.     On January 4, 2024, LLP issued two demand letters, signed by Defendant Saldarriaga, to LLI. Those demands were sent by email to Mr. Fangman and to his former United States address in Arizona.

62.     The first demanded payment of the promissory notes, $4.165 million on the principal note and $874,123 on the interest note. The demand included the contractual maturity date of December 31, 2023, and the contractual interest rates of 9% on the principal note and 0% on the interest note. No amount of additional interest earned on the principal note was specified in the demand letter.

63.     The second letter demanded payment of the $2.1 million loan. It made no reference to a promissory note, any specified interest rate, or maturity date. Nevertheless, it demanded payment on or before January 5, 2024.

64.     No demand was made for the $685,000 loan made on or around June 2021.

65.     The total amount specified in the demand letters was $7,139,123.

66.     There was no subsequent communication between the parties, and LLP provided no notice of any subsequent legal or other action.

**E.  Materially false and misleading statements issued in LPA public filings**

67.     Following those demands, LPA filed Amended Registration Statements, on January 16, 2024, February 23, 2024, and March 6, 2024. All three filings listed LLI as owning 8% of LLP's issued and outstanding ordinary shares.

68.     The February 23, 2024 and March 6, 2024 amended filings claimed, in a footnote, that LLI's shares were "beneficially owned by Michael Patrick Fangman Jr." and were "subject to a foreclosure proceeding in connection with a loan that is now in default." Those claims, however, were not made in LPA's discussion of LLP's related party transactions or in LLP's consolidated financial statements.

69.     In truth, no foreclosure proceeding has ever been initiated against LLI, and neither LLP nor LPA ever provided notice of any such foreclosure to LLI or Mr. Fangman. Likewise, LPA's or LLP's disclosure of legal proceedings in a public filing never reported any foreclosure proceeding.

70.     On March 12, 2024, LPA issued its Prospectus for issuance of more than 38 million ordinary shares of LPA and noted that, upon closing of the Business Combination, "Pubco Ordinary Shares will be listed on the New York Stock Exchange" for the initial public offering of LPA.

71.     That Prospectus was issued explicitly for "the Pubco securities to be issued to TWOA shareholders and LLP equity holders, if the Business Combination . . . is consummated."

72.     Once again, in that Prospectus, LPA and LLP acknowledged that, as of March 12, 2024, LLI owned 8% of LLP's issued and outstanding ordinary shares and that LLI held a right of redemption for ownership of LPA ordinary shares between 6% and 6.6% of the issued shares after the Business Combination. However, LPA reiterated the claim, in a footnote, that LLI's shares of LLP were subject to a foreclosure proceeding.

73.     Even assuming *arguendo* there was a foreclosure proceeding, based on LPA's and LLP's public statements, LLI had every reason to believe the value of the LLP ordinary shares it held, and the related right to LPA ordinary shares after merger, exceeded the value of the promissory notes and subsequent tax loans (not all of which were subject to the demand letters) by more than $14 million.

74.     In other words, while there could have been some doubt about LLI's ownership percentage of LPA's ordinary shares, LLI was guaranteed to be an LPA shareholder.

75.     In the Prospectus, LLP's consolidated financials included, for the first time, a statement that LLP had "initiated proceedings to collect the outstanding balance of the two notes receivable." There was no mention of collection for the tax loans made after the issuance of the promissory notes nor mention of a foreclosure proceeding or any other legal action.

76.     On March 27, 2024, the Business Combination was consummated, and the PIPE investment was finalized.

77.     On March 28, 2024, LPA shares were offered for trading on the NYSE.

78.     The very next day, LPA filed its Shell Company Report. That report included its unaudited pro forma financials. There, LPA falsely stated, "On March 12, 2024, LLI entered into

an assignment agreement with LLP, pursuant to which LLI unconditionally and irrevocably assigned in favor of LLP the right to receive 2,288,000 Pubco Ordinary Shares as a result of the Company Merger and the Business Combination Agreement."

79.    This was a knowing and intentional false and misleading statement. No such assignment agreement was executed by LLI. Indeed, LLI never received notice of any foreclosure proceeding, never received the necessary "letter of transmittal," required by the Business Combination Agreement, explaining how to exercise its option for LPA ordinary shares, and never signed any assignment to LLP.

80.    Yet, according to LPA, LLI signed that agreement on March 12, 2024, the *same day* that LPA's Prospectus affirmed (a) LLI's ownership of the LLP shares and (b) LLI's beneficial interest in LPA after the merger.

81.    Moreover, according to LPA and LLP, LLI assigned all rights to its 2,288,000 LLP shares, despite LLI's knowledge that, according to LPA's and LLP's publicly disclosed valuation, the value of those shares exceeded the amount demanded from LLI by roughly $15 million. That assignment also gave up LLI's contractual right, even after default, to receive any value above the amounts secured by the Pledge Agreement.

82.    Simply put, that assignment did not happen.

83.    The purported assignment was concealed from any public filing until after the Business Combination was consummated. Once done, Defendants revealed their intentional taking of LLI's equity shares of LLP and its right to issuance of LPA ordinary shares. The timing of the initial concealment of their intent to take LLI's shares and false statements about LLI's purported assignment of those shares, with a fair market value nearly $15 million in excess of

LLI's debt obligations, was also intentional. That timing prevented LLI from discovering the scheme until after it was refused its LPA ordinary shares.

84.     Following the purported assignment, LLP waived its newly created right to receive the LPA ordinary shares that LLI purportedly assigned.

85.     Based on that waiver, LPA disclosed that it transferred only 26,312,000 shares at closing with a per-share value of $10.87. In other words, LLP's other shareholders, including JREP I, beneficially owned by Defendant McDonald, concealed important information, failed to deliver the letter of transmittal necessary for LLI to exercise its right of redemption, and made knowingly and intentionally false statements to prevent LLI from exercising its rights under the Business Combination Agreement and to inflate the remaining shareholders' per share values.

86.     On April 26, 2024, LPA filed its Annual Report. Once again, LPA repeated the false and misleading statement that the loan receivable from LLP's tax loans to LLI was settled on the closing date of the Business Combination "in accordance with an assignment agreement entered into between LLP and LLI."

87.     In addition, in contrast to LPA's filing one month earlier, LLP's consolidated financials now inflated the value of the "principal note" from $6,950,000 to $7,139,123, as of December 31, 2023. LPA and LLP gave no explanation for the increase in principal when no additional loans were made to LLI after May 2022.

88.     To reiterate, LLP held two promissory notes from LLI. One for $4.165 million (based on the principal of tax loans made prior to December 31, 2020) and $874k (based on interest accrued by that date). LLP never amended or reissued those promissory notes.

89.     Throughout their public filings, LPA and LLP erroneously and falsely claimed promissory notes were "expanded." This is not true. The value of the promissory notes never

changed. Instead, new tax loans totaling $2.785 million were made in 2021 and 2022. The principal for all *loans* to LLI was $6.95 million.

90.     Approximately one month later, on May 24, 2024, LPA filed unaudited financial statements for LLP's first quarter of 2024. The story continued to evolve. LLP states inconsistently in Note 15 that the "principal amount of $6,265,000 . . . bears an annual interest rate of 9.0% (page 24), that the receivable principal was $6,950,000 (same), and that the principal for the "notes receivable" was $7,139,123 (page 25). Nevertheless, LLP claims the total value owed by LLI had climbed to $9,765,972 by March 27, 2024.

91.     In this filing, for the first time, LPA and LLP expressly acknowledged that the shares purportedly assigned by LLI had a fair market value of $24,481,600.

92.     LPA and LLP admitted that fair market value "exceeded the carrying value of the derecognized loan . . . by $14,715,628."

93.     Under the Pledge Agreement, LLP was required to apply any money or value received or recovered, first, to the discharge of the promissory notes and, second, to pay LLI any surplus. In other words, that excess value had to be paid to LLI or LLI retained the right to receive LPA ordinary shares equivalent to that amount.

94.     Instead, LPA and LLP determined to treat the entire $24,481,600 as a stock dividend to LPA. The excess $14,715,628 was wrongfully and tortiously retained by LPA and treated as additional paid-in capital by LLP. LPA and LLP did not provide any business explanation for why LLP's shareholders would pay in additional capital with no other benefit or additional shares received from LPA.

95.     Months later, in LPA's September 20, 2024 Prospectus, LPA stated that LLI's loan receivable had been "forgiven" as opposed to satisfied and discharged, as previously stated.

96.     As a result of Defendants' wrongful acts and omissions, Plaintiffs have suffered significant losses and damages, including the loss of their right to ownership of 2,288,00 LPA ordinary shares after closing of the Business Combination and/or loss of the excess fair market value of LLI's collateral above the promissory note values, even the inflated value of those notes as reported in LPA and LLP's filings. By LPA and LLP's own valuation, LLI's loss is equivalent to not-less-than $14,481,600.

97.     LLI had LLP ordinary shares in hand. Based on the Pledge Agreement, the Business Combination Agreement, and LPA's public filings, LLI should have received LPA ordinary shares when the merger closed. LLI's right to those shares vested when the Business Combination was consummated. Only LPA's and LLP's tortious and improper conduct has prevented LLI from receiving the shares owed to it.

<u>**COUNT ONE**</u>

**VIOLATION OF § 10(b) OF THE EXCHANGE ACT AND RULE 10b-5**
**(All Defendants)**

98.     Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

99.     This Count is asserted against Defendants and is based upon § 10(b)of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated by the SEC.

100.    To effectuate the Business Combination and cut Plaintiffs out of the resulting company (LPA), Defendants: engaged in a plan, scheme conspiracy, and course of conduct by which they knowingly and recklessly engaged in acts and practices that operated as a fraud and deceit upon Plaintiffs; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made not misleading; and employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities,

17

the closing of the Business Combination, and the initial public offering. That scheme was intended to and did: (i) deceive Plaintiffs as alleged herein; (ii) artificially inflate the per-share value of LPA ordinary shares and LPA's equity; and (iii) cause Plaintiffs to lose LPA ordinary shares owed to it. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein.

101.    Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Defendants participated, directly or indirectly, in the preparation and/or issuance of the Prospectuses, annual reports, SEC filings, and other statements and documents, as described above. Such reports were materially false and misleading in that they failed to disclose adverse information and misrepresented the truth about LPA's and LLP's business, operations, and financial condition.

102.    For example, LPA's and LLP's public filings consistently represented that LLI owned 8% of LLP shares and would be a beneficial owner of LPA after the Business Combination. Further, the Business Combination Agreement required LLP to provide a "letter of transmittal" outlining the steps to tender LLP shares in exchange for LPA shares. LLI reasonably relied on those public statements. Instead, LPA and LLP waited until the day *after* LPA shares were first issued on the NYSE to disclose a false claim that LLI had assigned all rights to its shares of LLP, including the right to redemption for LPA ordinary shares, which had a fair market value of over $24 million in order to satisfy an inflated demand of just over $9 million.

103.    Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs. Alternatively, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts that would reveal the materially false and misleading nature

of the statements made, although such facts were readily available to Defendants. Defendants'

acts and omissions were committed willfully or with reckless disregard for the truth.

104.    The Individual Defendants are liable both directly and indirectly for the wrongs

complained of herein. Because of their positions of control and authority, the Individual

Defendants were able to, and did, directly or indirectly, control the content of the statements of

LPA and LLP. As officers and/or non-independent directors of a publicly held company traded

on the NYSE, the Individual Defendants had a duty to disseminate timely, accurate, truthful, and

complete information with respect to LPA's and LLP's business. As a result of dissemination of

the false and misleading public statements, Plaintiffs were defrauded of LPA ordinary shares and

LPA inflated its equity and the per-share value of its ordinary shares. The true information was

not known by Plaintiffs.

105.    During the relevant period, LPA ordinary shares were traded on an active and

efficient market. Plaintiffs, relying on the materially false and misleading statements described

herein and operating without true information concealed by Defendants, were unable to exercise

their rights to possess LPA ordinary shares. Had Plaintiffs known the truth, they would have

exercised their rights to acquire the shares and redeemed a portion of those shares to repay the

promissory notes properly demanded, retaining the remaining LPA ordinary shares.

106.    By reason of the conduct alleged herein, Defendants have knowingly or

recklessly, directly or indirectly, violated § 10(b) of the Exchange Act and Rule 10b-5. As

outlined above, but for Defendants knowingly tortious conduct and false statements, LLI would

have received the LPA shares owed to it.

107.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs

suffered damages, in the form of loss of ordinary shares of LPA, in connection with the Business

Combination and LPA's initial public offering, and Plaintiffs did not discover this loss until reviewing LPA's false statements in public filings.

## COUNT TWO

### VIOLATIONS OF § 20(a) OF THE EXCHANGE ACT
### (Individual Defendants)

108.   Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

109.   This Count is asserted against the Individual Defendants for control person liability under § 20(a) of the Exchange Act, 15 U.S.C. § 78t.

110.   During the relevant period, the Individual Defendants participated in the operation and management of LPA and LLP and conducted and participated, directly or indirectly, in the conduct of LPA's business affairs. Because of their senior positions at or control of LPA, the Individual Defendants knew the truth about LPA's and LLP's business and the scheme to defraud Plaintiffs and artificially inflate LPA's equity and per-share value.

111.   As officers and directors of LPA, a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, with respect to LPA's business and financial condition, and promptly correct any public statement issued by LPA that had become materially false or misleading.

112.   Because of their positions of control and authority, the Individual Defendants were able to and did control the contents of LPA's and LLP's public filings disseminated in the marketplace concerning LPA's and LLP's business and financial condition. The Individual Defendants exercised their power and authority to cause LPA and LLP to engage in the wrongful acts complained of herein. Accordingly, the Individual Defendants were "controlling persons" of LPA within the meaning of § 20(a) of the Exchange Act. In these capacities, the Individual

Defendants participated in the unlawful conduct alleged herein, which defrauded Plaintiffs and artificially inflated LPA's equity and per-share value.

113.    By reason of the above conduct, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act for the violations committed by LPA.

## COUNT THREE

### VIOLATIONS OF § 11 OF THE SECURITIES ACT
### (All Defendants)

114.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

115.    This Count is asserted against the Individual Defendants for control person liability under § 11 of the Securities Act, 15 U.S.C. § 77k.

116.    This cause of action alleges and sounds in strict liability and negligence. It expressly excludes and disclaims any claim of fraud.

117.    The Registration Statement, initially and as amended, contained untrue statements of material facts, failed to state other facts necessary to make the statements not misleading, and omitted material facts required to be stated therein.

118.    Defendants are strictly liable to Plaintiffs for the misstatements and omissions.

119.    None of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement, as amended, were true and without omissions of any material facts and were not misleading.

120.    By reason of the above conduct, Defendants violated, or controlled an employee or agent who violated, § 11 of the Securities Act.

121.    As explained above, LLI held a vested right to LPA ordinary shares at the close of the Business Combination. LLI should be considered the owner of those shares and would be in possession of the shares but-for Defendants' tortious actions.

## COUNT FOUR

### VIOLATIONS OF § 12(a)(2) OF THE SECURITIES ACT
### (All Defendants)

122.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

123.    This Count is asserted against the Individual Defendants for control person liability under § 12(a)(2) of the Securities Act, 15 U.S.C. § 77l.

124.    This cause of action alleges and sounds in strict liability and negligence. It expressly excludes and disclaims any claim of fraud.

125.    The Prospectus, especially the March 12, 2024 Prospectus issued for the shareholders of LLP and "two," and related oral communications contained untrue statements of material facts, failed to state other facts necessary to make the statements not misleading, and omitted material facts required to be stated therein, as detailed above.

126.    Defendants owed Plaintiffs, who received or should have received LPA shares pursuant to the Business Combination and Pledge Agreement, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission of a material fact required in order to make the statements contained therein not misleading. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus.

127.    By means of the Prospectus and related oral communications, Defendants promoted, solicited, or sold LPA shares, or caused LPA shares to be issued. Defendants were

sellers to and direct solicitors of purchasers of LPA shares offered pursuant to the Business Combination. Defendants issued, caused to be issued, signed, or authorized the signing of the Prospectus in connection with the public offering and used it to induce investors to purchase LPA shares, or to believe LPA shares would be issued automatically.

128.    Plaintiffs did not know, nor in the exercise of reasonable diligence could they have known, of the falsehoods and omissions contained in the Prospectus at the time the Business Combination closed two weeks later.

129.    By reason of the above conduct, Defendants violated, or controlled an employee or agent who violated, § 12(a)(2) of the Securities Act.

130.    As explained above, LLI held a vested right to LPA ordinary shares at the close of the Business Combination. LLI should be considered the owner of those shares and would be in possession of the shares but-for Defendants' tortious actions.

<u>**COUNT FIVE**</u>

**VIOLATIONS OF § 15 OF THE SECURITES ACT**
**(Individual Defendants)**

131.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

132.    This Count is asserted against the Individual Defendants for control person liability under § 15 of the Securities Act, 15 U.S.C. § 77o.

133.    This cause of action alleges and sounds in strict liability and negligence. It expressly excludes and disclaims any claim of fraud.

134.    The Individual Defendants were controlling persons of LPA by virtue of their positions as directors and senior officers of LPA and LLP. At all relevant times, the Individual Defendants participated the operation and management of LPA and conducted or participated,

directly or indirectly, in the conduct of its business affairs. As directors and officers of a publicly traded company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to LPA. Because of their positions of control and authority, the Individual Defendants were able to, and did, control the contents of LPA's public filings, which contained materially false statements and omissions.

135.    LPA, LLP, and the Individual Defendants were each culpable participants in the violations of §§ 11 and 12(a)(2) of the Securities Act, based on their having signed or authorized the public filings and having otherwise participated in the process which allowed the Business Combination to be consummated.

**COUNT SIX**

**BREACH OF CONTRACT**
**(LPA and LLP)**

136.    Plaintiff LLI realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

137.    In 2020, LLP and LLI entered into the Pledge Agreement, providing security for LLI's promissory notes linked to prior tax loans.

138.    Following an event of default, that agreement requires LLP to provide a demand for the amounts owed. If repayment is not made, LLP had the right to sell or dispose of LLI's shares of LLP securing the promissory notes or to transfer title to the shares to LLP.

139.    For any sale or transfer, the value attributed to the shares was required to be the market value of the shares.

140.    Any value recovered by LLP was required to be applied first to satisfaction of the secured notes and then repaid to LLI.

141.    Instead, LLP falsely claimed that LLI assigned the shares to LLP and waived its right to LPA ordinary shares, reducing the number shares issued by LPA and inflating LPA's equity position.

142.    LLP itself valued the shares at $24,481,600; yet, it did not make any payment to LLI or return any of the LLP shares for conversion into LPA ordinary shares. Likewise, LPA did not issue shares owed to LLI.

143.    LLP's breach proximately caused LLI actual and consequential damages, which include the loss of the value of LLI's shares of LLP above satisfaction of the outstanding note that came to maturity on December 31, 2023, in an amount not less than $14,715,628.

144.    LPA is named in the Count because, according to LPA, "[t]he historical operations of LLP prior to the Business Combination are deemed to be those of [LPA]."

## COUNT SEVEN

### FRAUD
### (LPA and LLP)

145.    LLI realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

146.    As detailed above, LPA and LLP knowingly and intentionally made false statements that they had complied with the requirements of the Business Combination Agreement, that LLI had promissory notes in excess of $9 million, that LLP had instituted foreclosure proceedings on LLI's shares, and that LLI had entered into an assignment agreement.

147.    Likewise, LPA and LLP knowingly and intentionally concealed information by omitting material information on the companies' activities with respect to LLI's pledged shares. In particular, LPA and LLP concealed their false claim that LLI had executed an assignment agreement until two days after the consummation of the Business Combination.

148.     As a minority shareholder without equal access to LLP's and LPA's information and as a member of the public reviewing publicly filed statements, LLI justifiably relied on LLP's and LPA's statements regarding its ownership interests in both LLP and, after consummation of the Business Combination, LPA; their statements regarding the right to transfer LLP shares for those of LPA shares at closing; their statements regarding the necessary information to be provided prior to closing the Business Combination; their valuation of LLI's equity shares; and their statements on the process for disposal of security under the Pledge Agreement.

149.     Instead, LPA and LLP concealed their intention to strip LLI of its equity shares and ownership and to withhold both payment of the value above LLI's obligations and LLI's right to LPA shares after the Business Combination.

150.     As a result of the fraud, LLI was damaged by the loss of its shares of LLP, the value of those shares above the mature note, and the loss of its option for LPA shares following the consummation of the Business Combination.

151.     This fraud claim is inextricably linked to public statements made in SEC filings, public offerings of LPA ordinary shares, and the Business Combination Agreement that created LPA for the purpose of offering securities for trade on the NYSE.

## COUNT EIGHT

### UNJUST ENRICHMENT
### (LPA)

152.     LLI realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

153.    LPA did not and does not have a contractual relationship with Plaintiffs. Nevertheless, LPA knowingly and intentionally accepted a "stock dividend" of more than $24 million paid by LLP.

154.    LPA voluntarily accepted and kept as additional paid-in capital more than $14 million, according to LPA's and LLP's calculation, above the value of the note satisfied by its wholly owned subsidiary.

155.    LPA has been unjustly enriched by the value of that improper stock dividend, at a minimum, which was used to inflate LPA's equity and boost the per-share value of LPA's ordinary stock.

156.    Accordingly, LPA has been enriched at LLI's expense. They have profited and will continue to derive profits from the improper taking of LLI's shares in LLP and the improper retaining of the value of those shares above the mature note. Defendants cannot, in equity and good conscience, be permitted to retain that benefit.

157.    Accordingly, an amount not less than $14,715,628, and likely much more due to the inflated value attributed to the promissory notes, should be returned to LLI.

## COUNT NINE

### CIVIL CONSPIRACY
### (All Defendants)

158.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

159.    As detailed above, LLP and LPA, and the officers and non-independent director named, jointly operated to defraud LLI of shares of LLP, the value of those shares above the mature note, and LLI's option for possession of LPA shares.

160.    The entities are operated by a common group of officers and directors, and LPA controls the actions of its wholly owned subsidiary.

161.    Defendants took acts, through false statements, improper taking, or tortious retention of LLI's pledged shares or the value of those shares above the mature notes.

162.    The joint actions were undertaken to violate the Exchange Act and to commit the tortious and fraudulent conduct detailed above, and the conspiracy damaged Plaintiffs in the amount of, not less than, $14,715,628.

## DAMAGES, FEES, AND COSTS

WHEREFORE, Plaintiffs pray for relief and judgment against Defendants as follows:

A.    Awarding of compensatory damages in favor of Plaintiffs against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proved at trial, including pre- and post-judgment interest thereon;

B.    Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including attorneys' fees and expert or consultant fees; and

C.    Awarding rescission, disgorgement, or such other equitable or injunctive relief as deemed just and proper by the Court.

## JURY DEMAND

Plaintiffs demand a jury on all issues so triable.

*   *   *   *

Dated:  March 12, 2025

Respectfully submitted,

*/s/ Jake Banks*_____
James L. Banks IV (S.D. Fla. Bar No. 1035232)
FORMAN WATKINS & KRUTZ LLP
210 East Capitol Street, Suite 2200
Jackson, MS 39201-2375
Telephone:  (601) 960-8600
Email:  jake.banks@formanwatkins.com

*Counsel for Plaintiffs LLI & Michael Fangman*

OF COUNSEL:

Edwin S. Gault (*pro hac vice* forthcoming)
C. Mitch McGuffey (*pro hac vice* forthcoming)
FORMAN WATKINS & KRUTZ LLP
210 East Capitol Street, Suite 2200
Jackson, MS 39201-2375
Telephone:  (601) 960-8600
Email:  win.gault@formanwatkins.com
Email:  mitch.mcguffey@formanwatkins.com

W. Lawrence Deas (*pro hac vice* forthcoming)
LISTON & DES, PLLC
605 Crescent Boulevard, Suite 200
Ridgeland, MS 39157
Telephone:  (601) 981-1636
Email:  Lawrence@listondeas.com

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that a copy of the foregoing pleading was filed electronically with the Clerk of Court using the Court's CM/ECF system and a copy sent to all counsel of record by electronic means on the 12th day of March, 2025.

*/s/ Jake Banks*
James L. Banks IV